**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL L. DOMINGUEZ,        )
                                   )
              Plaintiff,       )       Civil Action No. 11-13 Erie
                                   )
      v.                     )
                                   )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,   )
                                 )
            Defendant.     )

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN J., District Judge.

## I.     INTRODUCTION

Michael L. Dominguez, ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq*. and § 1381 *et seq*. Plaintiff filed his applications on January 3, 2007,[1] alleging disability since March 8, 2004[2] due to bipolar disorder and diabetes (AR 82-95; 119 ).[3] His applications were denied (AR 60-68), and following a hearing held on October 27, 2008 (AR 21-42), the administrative law judge ("ALJ") issued his decision denying benefits to Plaintiff on November 14, 2008 (AR 11-20). His request for review by the Appeals Council was denied (AR 1-5), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). Plaintiff filed his

---

[1] Plaintiff filed prior applications for benefits on March 26, 1991, August 1, 1995 and March 25, 2004 (AR 11). The 1991 applications were denied at the initial level without further appeal (AR 11; 115). The 1995 applications were denied at the initial level and following a request for a hearing, were administratively dismissed without further appeal (AR 11; 115). Plaintiff's March 25, 2004 applications were denied, and following a hearing before an ALJ (11; 114), this Court denied Plaintiff's motion for summary judgment and granted the Commissioner's motion for summary judgment on February 11, 2008. *Dominguez v. Asrue*, No. 07-59 (W.D.Pa. Feb. 11, 2008).

[2] Plaintiff amended his alleged onset date to June 28, 2006 at the administrative hearing (AR 26).

[3] References to the administrative record [ECF No. 5], will be designated by the citation "(AR ___)".

complaint challenging the ALJ's decision, and presently pending before the Court are the parties' cross-motions for summary judgment. For the following reasons, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.

## II.    BACKGROUND

Plaintiff was 41 years old on the date of the ALJ's decision and has a limited education (AR 19; 125). He has past relevant work experience as a laborer, mechanic and wheel barrow specialist (AR 120). Plaintiff claims disability based on his alleged mental and physical impairments.

*Medical History*

*A.    Mental impairments*

Plaintiff was treated at Corry Counseling Center for his mental impairments (AR 174-219). Treatment records reveal that Plaintiff has been diagnosed, at various times, with the following conditions: depression, bipolar disorder, ADHD, alcohol abuse, alcohol abuse in remission, impulse control disorder, and/or partner relational problems, for which he has been prescribed medication (AR 174-213). On June 13, 2006, Plaintiff was seen by Carolyn Eastman, R.N. and reported no significant change in his mood swings (AR 213). Plaintiff stated that he continued to experience occasional irritability, but was able to control his impulses to act out (AR 213). He denied suffering from any suicidal or homicidal ideations (AR 213). He requested an adjustment in his medication regimen due to some daytime sleepiness, and Ms. Eastman noted that progress had been made in his treatment (AR 213). On June 19, 2006, Ms. Eastman noted that Plaintiff's therapy was complete and he was transferred to medication management (AR 214).

Plaintiff continued to complain of daytime sleepiness on July 19, 2006 and his medications were decreased (AR 215). On July 26, 2006, Plaintiff was seen by Asha Prabhu, M.D., and reported that he had stopped taking his medication because it made him tired (AR 217). It was noted that Plaintiff had tried numerous mood stabilizers, including Depakote, Lithium, Seroquel and Geodon (AR 217). Plaintiff stated that he was very irritable and angry,

but denied suicidal or homicidal thoughts (AR 217). Topamax was prescribed for his symptoms (AR 217).

Plaintiff underwent a psychiatric evaluation at Stairways Behavioral Health performed by Robin Bailey, M.D. on December 21, 2006 (282-286). Plaintiff complained of lifelong symptoms of anger and volatile moods, and impulsive and reckless behavior (AR 282). Plaintiff claimed that his symptoms worsened with age (AR 282). It was noted that Plaintiff was in a fairly stable relationship for ten years, had avoided the criminal justice system, (except for a remote DUI), had been able to maintain a stable job for seven years, and had not been involved in any physical altercations in recent years (AR 282). At the evaluation, Plaintiff complained of sleep disturbances, "little patience", energy fluctuations, and problems with concentration (AR 283). His mood was primarily euthymic, with episodes of irritability (AR 283). He acknowledged some suicidal thoughts, but had no plan or intent (AR 283). He denied any symptoms of anxiety, panic, obsessive-compulsiveness and paranoia (AR 283). Plaintiff stated he had ongoing problems with "hearing a crowd" and experienced mania symptoms, including impulsiveness and self-endangering behavior (AR 283). Plaintiff was not on any medications for his symptoms (AR 283). Plaintiff reported he had been diabetic since age 21 and it was uncontrolled (AR 283).

On mental status examination, Dr. Bailey found Plaintiff had poor hygiene with dirty hands and numerous cuts on his right hand (AR 285). Dr. Bailey found Plaintiff was cooperative, maintained good eye contact and had an appropriate affect (AR 285). Dr. Bailey noted that his speech was normal in rate and production, and that his thoughts were logical and goal directed (AR 285). Plaintiff was unable to perform serial 7's but was able to spell "earth" backwards and remember three out of three objects at two minutes (AR 285).

Dr. Bailey formed an impression that Plaintiff had lifelong symptoms of impulsivity and irritability, and, indirectly, self-destructive behavior (AR 285). She noted that years of pharmacotherapy had not produced a significant benefit (AR 285). Dr. Bailey diagnosed Plaintiff with, *inter alia*, bipolar disorder not otherwise specified, rule out attention deficit disorder, and alcohol dependency history (AR 286). She assigned him a Global Assessment of

Functioning ("GAF") score of 51-53 (AR 286).[4]   Plaintiff declined counseling, and Dr. Bailey prescribed Neurontin (AR 286).

When seen by Dr. Bailey on January 11, 2007, Plaintiff reported sleeping better (AR 287).  Plaintiff reported being "stressed" over events the previous day involving his children and multiple arguments with his spouse (AR 287).  On mental status examination, Dr. Bailey found Plaintiff displayed adequate grooming and hygiene, and his thoughts were logical and goal directed (AR 287).  Plaintiff denied any suicidal or homicidal thoughts (AR 287).  His diagnosis remained unchanged, and Dr. Bailey increased his Neurontin dosage (AR 287).

On January 29, 2007, Dr. Bailey completed a Medical Source Statement of Plaintiff's ability to perform mental work related activities (AR 288-290).  Dr. Bailey found that Plaintiff had no limitations in his ability to understand, remember, and carry out short, simple instructions (AR 289).  She further found that Plaintiff was moderately[5] limited in his ability to understand, remember and carry out detailed instructions; make simple work-related decisions; interact appropriately with the public, supervisors and co-workers; and respond appropriately to changes

---

[4] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

[5] "Moderate" is defined on the form as a "moderate limitation in this area, but the individual is still able to function satisfactorily." (AR 288).

in a routine work setting (AR 289).  Dr. Bailey found that Plaintiff was markedly[6] limited in his ability to respond appropriately to work pressures in a usual work setting (AR 289).  Dr. Bailey noted that her assessment was based upon her clinical interview with the Plaintiff, and the Plaintiff's "self report" (AR 289).

On February 23, 2007, Edward Jonas, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric evidence of record and determined that Plaintiff had mild limitations in completing activities of daily living; moderate difficulties in maintaining concentration, persistence or pace; and moderate difficulties in maintaining social functioning (AR 311).  Dr. Jonas completed a mental residual functional capacity assessment form, and opined that Plaintiff was not significantly limited or only moderately limited in a number of work-related areas (AR 297-298).  He found that Plaintiff could understand, retain and follow simple job instructions involving one and two step tasks, and make simple decisions (AR 299).  Dr. Jonas concluded that Plaintiff remained capable of meeting the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment (AR 299).

On March 29, 2007, Stairways progress notes indicated that Plaintiff was compliant with his medications (AR 382).  He reported moderate feelings of depression and occasional feelings of anxiety (AR 382).

On April 16, 2007, Plaintiff reported to Dr. Bailey that Neurontin helped his symptoms but slowed his "reactivity" (AR 379).  Plaintiff continued to complain of becoming "highly angry" and volatile, stating that he had become physically aggressive towards his wife (AR 379).  He described his mood as "bad" (AR 379).  On mental status examination, Dr. Bailey reported Plaintiff's mood was irritable and dysphoric[7] (AR 379).  He had suicidal thoughts, but no active plan (AR 379).  He was diagnosed with a mood disorder and Celexa was added to his medications (AR 379).

---

[6] "Marked" is defined on the form as a "serious limitation in this area.  The ability to function is severely limited but not precluded." (AR 288).
[7] Dysphoria is defined as "disquiet; restlessness; malaise."  *Dorland's Illustrated Medical Dictionary* 579 (32nd ed. 2012).

When seen by Dr. Bailey on May 17, 2007, Plaintiff reported increased stress (AR 378). He stated that Celexa made him tired (AR 378). Plaintiff claimed his main issue was his "temperament" and irritability (AR 378). On mental status examination, Dr. Bailey found he was cooperative and his thoughts were logical, but he was pervasively irritable (AR 378). He denied any suicidal or homicidal thoughts (AR 378). Dr. Bailey increased his Neurontin dosage, stopped the Celexa and started Plaintiff on Effexor (AR 378).

Plaintiff complained of depression, irritability, lack of motivation, anxiety and stress at his visit on August 1, 2007 (AR 377). Dr. Bailey found his mood and affect to be irritable and rude, and he was verbally abusive when talking about his pharmacy (AR 377). He was cooperative during the visit and denied any suicidal or homicidal thoughts (AR 377). Generic Effexor was prescribed and he was continued on Neurontin (AR 377).

On September 24, 2007, Plaintiff reported that he stopped taking Effexor because it caused an upset stomach (AR 374). Plaintiff complained of irritability, and his mood and affect were reported as irritable (AR 374). Plaintiff had passive suicidal thoughts (AR 374). He was continued on Neurontin for his bipolar disorder, Effexor was discontinued, and he was started on a trial of Lamictal (AR 374).

On October 8, 2007, Plaintiff reported that Neurontin made him tired (AR 373). On mental status examination, Dr. Bailey reported that Plaintiff's speech was spontaneous, but he was preoccupied with his neck and back pain (AR 373). Plaintiff denied suicidal thoughts, stating that he "always want[ed] to hurt someone else," and avoided contact with others (AR 373). His medications were continued (AR 373).

Plaintiff also received mental health treatment at Safe Harbor Behavioral Health (AR 401-413). On March 28, 2008, Plaintiff was evaluated by Melissa Olivett, M.S., Ph.D. Intern (AR 401-406). Plaintiff complained of anger problems, rapid mood changes, sleep disturbances, a decreased energy level, attention and concentration problems, and isolating behavior (AR 401). On mental status examination, Ms. Olivett found Plaintiff fully oriented, cooperative and alert (AR 404). He had adequate hygiene and was appropriately dressed (AR 404). Plaintiff's speech was spontaneous; his thought processes were organized, relevant and circumstantial; and his

affect was anxious but appropriate (AR 404). She further found his judgment to be poor and his insight fair (AR 404). She diagnosed Plaintiff with bipolar disorder and assigned him a GAF score of 45 (AR 405).

A psychiatric evaluation was performed by Ralph Walton, M.D. on June 3, 2008 (AR 407-408). Plaintiff reported that he was "full of hate" (AR 407). He stated that he had a tendency to be either very depressed or very high (AR 407). Plaintiff reported that his "high" periods could last up to one week at a time, causing him to be extremely reckless, irritable and aggressive (AR 407). On mental status examination, Dr. Walton found Plaintiff fully oriented and capable of presenting his history in an organized fashion (AR 407). He described hearing "constant chatter" from multiple voices but was unable to discern what was being said (AR 408). Dr. Walton found no obvious delusional processes (AR 408). He was diagnosed with bipolar disorder and assigned a GAF score of 48 (AR 408). He was prescribed Abilify (AR 408).

On July 15, 2008 Plaintiff was seen by Matthew Behan, D.O. and complained that he was "in a bad mood," was irritable, and had conflicts with those around him (AR 410). Dr. Behan found no obvious signs or symptoms of psychosis or mania, and Plaintiff denied any suicidal or homicidal thoughts (AR 410). He was diagnosed with bipolar disorder and assigned a GAF score of 52, and his Abilify dosage was increased (AR 410).

Plaintiff returned to Safe Harbor on September 19, 2008 and treatment notes reflect that he was depressed and unmotivated, and "somewhat anhedonic"[8] (AR 409). He claimed he had difficulty "sitting still" (AR 409). On mental status examination, a registered nurse reported that Plaintiff was sarcastic and somewhat irritable, although he answered questions appropriately and became more pleasant as the interview progressed (AR 409). He was diagnosed with bipolar disorder, assigned a GAF score of 45, and Paxil and Cogentin were added to his medication regimen (AR 409).

---

[8] Anhedonia is defined as "the absence of pleasure from the performance of acts that would ordinarily be pleasurable." *Steadman's Medical Dictionary* 88 (27th ed. 2000).

*B. Physical impairments*

Plaintiff was treated by Andrew King, M.D. at the Union City Family Practice for his diabetes and musculoskeletal impairments (AR 220-279; 320-370; 390-400).  On July 31, 2006, Dr. King treated Plaintiff for a shoulder injury following a fall from a bicycle the previous day (AR 249-250).  X-rays showed a separated left shoulder, but no fracture or abnormality (AR 238).  X-rays of the Plaintiff's ribs were normal (AR 239).  Physical examination revealed tenderness with motion of his shoulder (AR 250).  He was neurologically intact and had a normal range of motion without an increase in his symptoms (AR 250).

On September 7, 2006, Dr. King reported that Plaintiff's diabetes was under poor control due to a "compliance issue" and the scheduling of his insulin (AR 248).  His physical examination was unremarkable (AR 248).  On December 1, 2006, Dr. King noted that Plaintiff's glucose levels were elevated (AR 357).

On January 26, 2007, Dr. King reported that Plaintiff's diabetes was controlled and he was semi-compliant with his regimen, but was not following his diabetic diet or getting adequate exercise (AR 352).  Plaintiff complained of left shoulder pain with numbness and tingling in his fingers and left hand, possibly related to shoveling snow (AR 352).  Plaintiff was in no acute distress and his physical examination was unremarkable (AR 353).

On February 5, 2007, Thomas Williamson, a state agency examiner, reviewed the medical evidence of record and concluded that Plaintiff had no physical limitations (AR 291-296).

Plaintiff returned to Dr. King on May 11, 2007, who reported that Plaintiff was following his diabetic diet and getting adequate exercise (AR 349).  On July 31, 2007, Dr. King noted that Plaintiff's diabetes was controlled (AR 345).  Plaintiff complained of bilateral hip pain aggravated by walking and increased activity (AR 345).  Physical examination of the Plaintiff's hips revealed normal range of motion but pain was elicited at internal rotation and extreme external rotation (AR 347).  Examination of Plaintiff's lumbosacral spine revealed no abnormalities, with the exception of pain on both sides of the piriformis area (AR 347).  He was

assessed with osteoarthritis of the hip and sciatica, advised to take Tylenol, and instructed on home exercise (AR 346).

On September 11, 2007, Plaintiff complained of hip pain, left arm numbness and low back pain with some sciatic symptoms (AR 341). Physical examination of Plaintiff's neck revealed decreased range of motion with most movements and some crepitus (AR 342). Physical examination of Plaintiff's back revealed some paraspinal tenderness on palpation and increased "soreness" on bending, flexion and extension, but there were no radiating symptoms (AR 342). He was assessed with, *inter alia*, myalgias and osteoarthritis of the hip, and his medications were continued (AR 343). His diabetes was reported as controlled (AR 341).

A lumbar spine x-ray dated September 12, 2007 showed minimal degenerative spur formation at the L4 and L5 level and minimal retrolisthesis[9] of L2 on L3 (AR 339). An x-ray of Plaintiff's thoracic spine showed minimal degenerative change, but was otherwise unremarkable (AR 339). A left shoulder x-ray revealed a widening of the AC joint consistent with AC separation (AR 340). A cervical spine x-ray showed disc space narrowing at C5-C6 and minimal anterior subluxation of C3 on C4, but was otherwise unremarkable (AR 340).

On September 25, 2007, Plaintiff complained of right shoulder pain and requested pain medication (AR 364). On October 11, 2007, Plaintiff complained of low back pain that began two weeks prior while working under a car (AR 336). Plaintiff indicated he was seeing a chiropractor for left arm and shoulder pain (AR 336). He requested a different pain medication, but Dr. King noted his diagnostic studies were "fairly unremarkable" (AR 336). Plaintiff's physical examination revealed some neck spasm and light crepitus with movement (AR 337). There was also some lumbar muscle soreness and increased pain with leg lifts, but no neurological symptoms were found (AR 337). Dr. King noted that Plaintiff's blood sugar readings were "about the same" and no increase in symptoms were reported (AR 336). Plaintiff was assessed with diabetes, osteoarthritis of the hip, a backache, and a bulging cervical disc (AR

---

[9] Retrolisthesis is a "backward slippage of one vertebra onto the vertebra immediately below." http://medical-dictionary.thefreedictionary.com/retrolisthesis.

338).  Plaintiff was prescribed pain medication and referred to physical therapy for his low back pain (AR 338).

On October 13, 2007, Dr. King completed a Medical Assessment Form for the Department of Public Welfare stating that Plaintiff was temporarily incapacitated from July 30, 2006 until November 30, 2007, due to a primary diagnosis of hip pain and a left shoulder injury, and a secondary diagnosis of depression, poorly controlled diabetes, and hyperlipidemia (AR 331-333).

An MRI of the Plaintiff's cervical spine dated October 17, 2007 was negative, showing no evidence of a disc bulge or herniation (AR 330).

On November 15, 2007, Dr. King completed an Employability Re-Assessment Form for the Department of Public Welfare stating that Plaintiff was permanently disabled due to a primary diagnosis of diabetes and degenerative joint disease, and a secondary diagnosis of depression (AR 326-327).

Plaintiff attended physical therapy for 13 sessions in November and December of 2007 for his complaints of low back pain (AR 316-319).  The discharge summary dated December 21, 2007 revealed that Plaintiff's back pain had decreased resulting in increased function (AR 316).

When seen by Dr. King on December 21, 2007, Plaintiff continued to complain of low back and neck pain, but stated that back pain had improved with physical therapy (AR 322).  Dr. King noted Plaintiff was non-compliant with his diabetic diet, exercise regimen, and blood sugar testing (AR 322).  Plaintiff complained of excessive urination and fatigue in his legs (AR 322). On physical examination, Dr. King found Plaintiff's neck was supple and showed no abnormalities (AR 323).  Some tightness and soreness was found in Plaintiff's lumbar spine at the paraspinal muscles, with some sacroiliac joint soreness noted as well (AR 324).

Plaintiff returned to Dr. King on April 24, 2008 and complained of neck, shoulder and back pain (AR 393).  Dr. King noted that Plaintiff had a cervical bulging disc in his neck (AR 393).  Plaintiff's blood sugars were running "high" but Dr. King noted Plaintiff was somewhat non-compliant with respect to his diabetes and he reported no new symptoms (AR 393).  On physical examination, Plaintiff's neck was supple with no abnormalities noted (AR 394).

10

Tenderness to palpation was found in the paraspinal muscles in the upper thorax and cervical area, as well as toward his left shoulder (AR 395). Plaintiff's lumbar examination revealed bilateral paraspinal muscle soreness, and his sacroiliac joint was "somewhat" tender (AR 395). Dr. King referred Plaintiff for pain management and a neurological consult (AR 396).

On May 6, 2008, Plaintiff was evaluated by Daniel Muccio, M.D. for his complaints of neck and low back pain (AR 387). On physical examination, Plaintiff exhibited 5/5 strength throughout, normal 2+ deep tendon reflexes, and normal 2+ pulses (AR 388). Straight leg raise testing was negative and his sensation was intact to light touch (AR 388). Dr. Muccio noted that a previous cervical MRI showed some degenerative changes with mild disc bulging, but there was no nerve root impingement or spinal cord compromise (AR 388). He further noted that lumbar x-rays showed some degenerative changes and shallow level scoliosis, and mild retrolisthesis of L2 on L3 (AR 388). Dr. Muccio formed an impression of degenerative joint disease of the cervical and lumbar spines (AR 388). He found Plaintiff was not in need of surgical intervention and recommended physical therapy (AR 389).

On May 15, 2008, an MRI of the Plaintiff's lumbar spine was normal, revealing no evidence of disc bulge or herniation, spinal stenosis, malalignment, or fracture (AR 400).

Finally, on August 25, 2008, Plaintiff returned to Dr. King and complained of back and leg pain (AR 390). Dr. King noted that Plaintiff's diabetes was "about the same unfortunately" and that he had a "long history of poor compliance" (AR 390). Physical examination revealed Plaintiff's neck was supple and his back was diffusely tender in the lumbar and sacroiliac area bilaterally (AR 392). He was prescribed pain medication, and "urged" to begin compliance with his diabetic regimen (AR 392).

*Administrative hearing*

Plaintiff and Paula Day, a vocational expert, testified at the hearing held by the ALJ on October 27, 2008 (AR 21-42). Plaintiff testified that he lived with his wife and five children (AR 27). Plaintiff claimed an inability to work due to problems with anger and diabetes (AR 29). He indicated that he reacted to criticism by occasionally throwing and breaking things (AR 38). He took Paxil and Abilify for his symptoms of anger and depression (AR 30). Plaintiff

11

testified that he occasionally talked with his neighbor, but did not attend family gatherings (AR 36). He further testified that he performed no household or outdoor chores, and drove "only when [he] had to" (AR 35-36). He did not read or watch television, but was able to cook, do the laundry, help his children with their homework, and play games on the computer with his 8-year-old (AR 36-37). Plaintiff stated he was not undergoing treatment for his previous shoulder injury (AR 33). Plaintiff further stated that he had attended physical therapy for his back pain, but had not undergone any further treatment (AR 33). Plaintiff testified he was able to lift 50 pounds, sit for 45 minutes before needing to change positions, and walk half a block (AR 34-35).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform medium or light work that involved only occasional contact with co-workers and the public, and only simple and routine one- or two-step tasks (AR 40). The vocational expert testified that such an individual could perform the medium positions of a hand packager and a laundry worker, and the light position of a garment press operator (AR 40).

Following the hearing, the ALJ issued a written decision finding that the Plaintiff was not entitled to a period of disability, DIB or SSI within the meaning of the Act (AR 11-20). His request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 1-5). He subsequently filed this action.

### III.    STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are

supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

## IV.    DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through December 31, 2008 (AR 13). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the

claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

The ALJ concluded that Plaintiff's back disorder, left shoulder disorder, diabetes mellitus and mood disorder were severe impairments, but determined at step three that he did not meet a listing (AR 14-15). The ALJ described the Plaintiff's residual functional capacity as follows:

> …[T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he can also do sedentary and light work. Specifically, the claimant can lift and/or carry 50 pounds; stand and walk for 6 hours in an 8-hour workday. He must have only occasional contact with co-workers and/or the public due to moderate limits in social functioning. The claimant can perform on (*sic*) simple, routine, repetitive, 1 or 2 step tasks, not performed in a fast-paced environment and involving relatively few work place changes, due to moderate limitations in concentration, persistence and/or pace.

(AR 15). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 19-20). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first challenges the ALJ's rejection of Dr. Bailey's opinion that he was markedly limited in his ability to respond appropriately to work pressures in a usual work setting. The Third Circuit has repeatedly held that "[a] cardinal principle guiding disability determinations is

that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).

In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence."). Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."); *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981) (without an adequate explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."). In rejecting Dr. Bailey's opinion, the ALJ stated:

Outpatient notes from Stairways Behavioral Health Outpatient Clinic on December 21, 2006 supports that the claimant alleged symptoms of impulsivity, irritability and longstanding self-destructive behavior. It was assessed that the claimant's substance abuse issues were not prominent at this time. The treatment plan indicated that the claimant was to focus on attempting to reduce his symptoms and establish a therapeutic relationship. Diagnoses were bipolar disorder, not otherwise specified, rule out attention deficit disorder, alcohol dependency by history, mixed personality disorders, diabetes mellitus and global assessment of functioning of 51 to 53, indicating moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic, few friends, conflicts with peers or co-workers) (Exs. B-2F and 4F).

Although a mental assessment indicates marked limitations in the claimant's ability to respond appropriately to work pressures in a usual work setting, this is inconsistent with the claimant's treatment regimen, lack of hospitalization and his moderate global assessment of functioning. No limitations were noted in the claimant's ability to understand, remember and carryout short, simple instructions. All other limitations were considered moderate in nature (i.e., ability to understand, remember and carryout detailed instructions, make judgments on simple work-related decision[s], interact appropriately with the public, supervisors and co-workers and respond appropriately to changes in a routine work setting). Treatment notes in March 2007 indicate the claimant was compliant with medication and had not missed any medication checks. The claimant reported moderate feel[ings] of depression and only occasional feelings of anxiety (Ex. B-2F, B-4F and B-10F).

Medical records from Safe Harbor Behavioral Health in March 2008 support allegations of rapid mood changes and anger. On mental status examination, the claimant was oriented, cooperative and alert with adequate eye contact. Thought processes were organized, relevant and circumstantial. Judgment was considered poor and insight was fair. At follow-up in June 2008, the claimant was fully oriented and acknowledged awareness of mild depression. The claimant reported he was unable to control his aggressive outburst. Although he also reported that he hears multiple voices telling him things, there were no obvious current delusional processes. Diagnoses were bipolar I disorder, moderately depressed and, Insulin dependent diabetes. While a global assessment of functioning of 48, indicating serious symptoms, was also noted, this is not well supported by the overall evidence and lack of inpatient hospitalization. Accordingly, minimal weight has been afforded this assessment. At follow-up on July 15, 2008, the claimant's global assessment of functioning was improved to 52, indicating moderate symptoms. The claimant denied having any physical altercations and suicidal or homicidal ideation (Ex. B-14F).

(AR 18).

Plaintiff first argues that the ALJ's rejection of Dr. Bailey's opinion is not supported by substantial evidence because it was based upon a selective and/or inadequate review of the medical records. Although the ALJ is not required to discuss every treatment note entry, he must "explicitly weigh all relevant, probative and available evidence" and "give some reason for the evidence [he] rejects." *Adorno v. Shalala*, 40 F.3d 47-48 (3d Cir. 1994).

In this case, the ALJ failed to discuss the remaining Stairways treatment note entries which reveal that Plaintiff suffered from anxiety, depression, suspicious feelings, impulsivity, anger, irritability and mood swings occurring "almost daily" or "constantly" (AR 380-381). For example, in April 2006, Plaintiff reported that he was angry and had suicidal thoughts, and Dr. Bailey reported that his mood was irritable and dysphoric, and he cursed frequently (AR 379). In May 2007, Plaintiff reported increased stress and irritability, and Dr. Bailey found he was "pervasively irritable" (AR 378). When he returned in August 2007, he complained of depression, irritability, anxiety and stress (AR 377). His mood and affect were reported as irritable and rude and he was verbally abusive (AR 377). In September 2007, Plaintiff complained of irritability and passive suicidal thoughts (AR 374). In October 2007, Plaintiff reported that he avoided contact with others (AR 373).

The ALJ further failed to discuss Plaintiff's medication regimen in his review of the medical evidence. An ALJ must consider the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate … symptoms." Social Security Ruling ("*SSR*") 96-7p, 1996 WL 374186 at *3. While the ALJ highlighted a treatment note entry dated March 2007 that Plaintiff was compliant with medication and had not missed any medication checks, there is no discussion by the ALJ that Plaintiff's medications were consistently changed and increased throughout his mental health treatment in order to control the above symptoms reported by Plaintiff and found by Dr. Bailey. (AR 287; 374; 377-379).

Plaintiff further challenges the ALJ's evaluation of his GAF scores in rejecting Dr. Bailey's opinion. A denial of benefits may be supported by substantial evidence even if the ALJ

does not discuss each GAF score in the record, as the GAF score "does not have a direct correlation to the severity requirement of the Social Security mental disorder listings, and GAF score of 45, if credited, would not require a finding of disability." *Gilroy v. Astrue*, 351 Fed. Appx. 714, 715 (3d Cir. 2009). As long as an ALJ does not "cherry-pick" or ignore medical assessments that run counter to his finding, a remand is not warranted. *Rios v. Comm'r of Soc. Sec.*, 444 Fed. Appx. 532, 536 (3d Cir. 2011).

In this case, the ALJ relied on the higher GAF scores in rejecting Dr. Bailey's opinion. Plaintiff's mental health treatment records contain GAF scores ranging from 45 to 52. The ALJ discussed some of these GAF scores, but rejected the GAF score of 48 found on June 3, 2008 as not supported by the overall record, and because a GAF score of 52 assessed one month later showed an improvement in Plaintiff's symptoms (AR 18). However, in relying on that later GAF score as demonstrative of an improvement in Plaintiff's mental health condition, the ALJ ignored the later GAF score of 45 assigned in September 2008, indicating serious symptoms. This is the type of "cherry picking" of GAF scores that is precluded by the above case law. Because the ALJ considered the GAF scores relevant and probative in determining whether Dr. Bailey's opinion was supported by the record, the ALJ should have considered and addressed this later GAF score.

In sum, the ALJ failed to fully discuss all pertinent treatment notes and findings as discussed above. On remand, the ALJ is directed to address this evidence consistent with *Cotter*.

Plaintiff further argues that the ALJ's evaluation of the medical evidence with respect to his physical impairments was also selective and incomplete. In this regard, Plaintiff first contends that the ALJ failed to consider any medical records dated after November 2006 with respect to his diabetes. Plaintiff cites to treatment note entries demonstrating the fluctuating nature of his diabetic condition as evidence by his blood sugar readings (AR 222-223; 353; 334-335). The ALJ however, specifically cited to and discussed treatment records revealing these similar findings (AR 17). The ALJ noted that Plaintiff's diabetes was under poor control in September 2006, and that the Stairways progress notes revealed that his diabetes was "brittle" and that his antipsychotic medications caused his condition to worsen (AR 17). In November

2006 Plaintiff's diabetes was reported as uncomplicated and uncontrolled (AR 17). It is undisputed that Plaintiff's diabetes was at times uncontrolled, but there is no evidence that Plaintiff suffered any complications or suffered from any specific limitations as a result. We therefore find no *Cotter* violation with respect to this evidence.

We further find no merit to Plaintiff's contention the ALJ erred in failing to discuss Dr. Mucio's treatment note entry noting that his cervical MRI showed degenerative changes with mild disc bulging (AR 388). The remainder of the MRI study revealed no evidence of nerve root impingment or spinal cord compromise (AR 388). In addition, Dr. Muccio's physical examination of Plaintiff revealed he had no physical limitations resulting from this condition (AR 388). Plaintiff exhibited 5/5 strength throughout, normal 2+ deep tendon reflexes, and normal 2+ pulses (AR 388). Dr. Mucio further found his straight leg raise testing was negative and his sensation was intact to light touch (AR 388). Finally, Plaintiff did not allege or testify to any physical limitations resulting from this impairment.

Plaintiff last challenges the ALJ's reliance on the opinion of Mr. Williamson, the state agency examiner, who reviewed the medical evidence of record and concluded that Plaintiff had no physical limitations (AR 291-296). Plaintiff contends that the ALJ erred in relying on Mr. Williamson's RFC assessment relative his physical impairments because Mr. Williamson was not a physician. The Commissioner argues that any error in this regard was harmless since the ultimate outcome would be unaffected on remand. We agree. In *Humphreys v. Barnhart*, 127 Fed. Appx. 73 (3d Cir. 2005), the claimant argued that it was reversible error for the ALJ to rely on the opinion of a state agency examiner who concluded that the claimant could perform light work. *Id*. at p. 75-76. The court found any reliance was harmless because it was not the sole basis for the ALJ's conclusion. *Id*. The ALJ also relied upon substantial objective medical evidence contradicting the treating physicians' opinions. *Id*. at p. 76. The court concluded that even absent a reference to the examiner's opinion, the overall record evidence supported the ALJ's decision to reject the opinions of the claimant's treating physicians that she was permanently disabled. *Id*.

Similar to the ALJ in *Humphreys*, the ALJ in this case also relied on other substantial evidence in concluding that Plaintiff was not precluded from working. The ALJ pointed to the objective diagnostic studies, which revealed either no abnormalities or mild findings (AR 17). The ALJ further pointed to the minimal findings on physical examinations (AR 17). The ALJ further found the lack of significant, ongoing treatment was inconsistent with disabling limitations (AR 17). Finally, Plaintiff himself testified he could lift 50 pounds, which is in accord with the exertional requirements of medium work (AR 15; 34-35). Accordingly, any error in relying on Mr. Williamson's assessment was harmless. *See Stewart v. Astrue*, 2012 WL 1969318 at *6 (E.D.Pa. 2012) ("even if there were a concern that the ALJ labored under the mistaken belief that the Physical RFC form … had been authored by a physician, the error would be harmless in light of the remaining record evidence providing substantial evidence for a finding that Stewart was capable of performing work at the light exertional level.").

## V.     CONCLUSION

For the reasons discussed above, both Motions will be denied and the matter will be remanded to the Commissioner for further proceedings.[10] An appropriate Order follows.

---

[10] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3d Cir. 2010).

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL L. DOMINGUEZ,     )
                          )
               Plaintiff,     )     Civil Action No. 11-13 Erie
                          )
     v.                     )
                          )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,    )
                          )
             Defendant.     )

## <u>ORDER</u>

AND NOW, this 14th day of August, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF No. 7] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 9] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

                                s/ Sean J. McLaughlin
                                 United States District Judge

cm:    All parties of record